IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MYRA G. HAYES O/B/O K.L.H., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:06cv1154-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

Myra G. Hayes o/b/o K.L.H.[1] brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for Supplemental Security Income under the

Social Security Act. The parties have consented to entry of final judgment by the Magistrate

Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by

the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

When plaintiff was 3 1/2 years old, he was evaluated by Dr. Edward Goldblatt at

Riverchase Family Health Center. His mother reported that he did not get along in pre-

kindergarten, threw rocks, hit, called names, and picked on a little girl. She indicated that,

during shopping trips, he pulled everything off of shelves and ran away. He was up several

times at night. Dr. Goldblatt diagnosed ADHD and prescribed Ritalin. (R. 258-59). Three

---

[1] K.L.H. will be referred to as the "plaintiff" in this memorandum of opinion.

months later, on November 14, 1995, plaintiff's mother reported that he was "kicked out" of school one month after he started. She indicated that she had noticed a small improvement in his attention span, but no improvement in his behavior – he remained very aggressive and hyperactive, and fought all the time. He was scheduled to begin counseling. (R. 255). Plaintiff continued periodic treatment at Riverchase for ADHD and asthma. (Exhibit 2F). In October 1997, when he was almost six years old, plaintiff was taking Adderall. His mother reported that his grades and attention span in school improved, that he completed his work, and that his grades in kindergarten were "all smiley face[s]." He continued to fight with his siblings, had decreased appetite and delayed onset of sleep. (R. 240). In July 1998, plaintiff's mother called to report that she had been told by Medicaid that, since plaintiff lived in Chilton County, plaintiff had to transfer to a physician in that county. (R. 239).

In August 1999, plaintiff's pediatrician referred him to Dr. Santhi Das for evaluation and medication monitoring. In the initial evaluation, plaintiff was hyperactive, unable to sit still and interrupted conversations. Dr. Das diagnosed ADHD "versus opposit[i]onal defiant disorder" and prescribed Imipramine and Adderall. (R. 270). The following month, plaintiff's mother reported that the medication seemed to be working "fairly well," that plaintiff was doing a lot better, sleeping well, and making good grades. A teacher evaluation indicated that "his problems are much less when he is on the medicines." (R. 269). In October 1999, plaintiff's mother reported that he was hyperactive, but that she could "manage him." She stated that he was stealing and lying. By January 2000, the lying and stealing had decreased, but plaintiff's mother complained that plaintiff was "yelling a lot."

2

Dr. Das noted that he still had hyperactive behavior and was easily frustrated, but seemed to be doing "fairly well." (R. 269). In February 2000, Dr. Das recorded that plaintiff continued to be hyperactive, that he was unable to sit still, and that he got upset easily, but that he was "doing fairly well." (R. 268). The following month, Dr. Das again noted that plaintiff was doing "fairly well." Treatment notes reflect that plaintiff was not eating much at school and that, when he missed his Ritalin, he had problems. He had not lost weight and was eating at home. (Id.). Dr. Das did not treat plaintiff again for four months. Dr. Das' treatment note for August 1, 2000 states:

> Is doing very well. Had no problems during summer holidays. He has been off of Ritalin. He climbs the walls most of the time, but is c[al]mer. I put him back on the medicines and told mother that if he does not need it during weekends, she might be able to keep him off of it. . . .

(R. 268). Two months later, however, Dr. Das increased plaintiff's medications after noting that he was "not doing well," very hyperactive, stealing from others, and not able to concentrate well. Dr. Das added, "He might be bordering on some obsessive behaviours." (R. 267). In January 2001, Dr. Das' treatment note indicates that plaintiff was "doing very well," except that his school grades had fallen in some subjects and improved in some. Plaintiff's mother reported that he was not sleeping at all, and that the Prozac had helped to calm him down. Dr. Das added a prescription for Vistaril. (Id.). Dr. Das stated as follows in a treatment note for an office visit in March 2001:

> Has developed a behaviour of self injury. Tried to scratch himself on his face. His dog bit him on his ear and he has been pulling that off and gets excited when he sees blood. He also [has] hallucinations. Talks to himself and im[a]ginary people. . . . I suggested to increase the Prozac to 1 1/2 tablet, 15

3

mg in the morning, stay on Ritalin as it is and is adding Seroquel 25 mg at h.s. Also told the mother that this appears to be more of a behaviour problem than any psychotic illness, and probably he will grow out of it, however, because of the hallucinations I am adding Seroquel.

(R. 266). In April 2001, Dr. Das recorded that plaintiff was "doing a lot better than before." He was reportedly taking his medications as prescribed, was calmer, had not had "any bad episodes so far in school or at home," and was "not hyperactive." (Id.)

On September 24, 2001, when plaintiff was in the fourth grade, plaintiff's mother took him to the Chilton-Shelby Mental Health Center for an intake evaluation. Plaintiff had been placed in in-school suspension for one day and was suspended from the bus for one day because of behavioral problems. (R. 8, 11). His mother was concerned that his ADHD medications were not effective. (R. 11). The counselor diagnosed him with ADHD - combined type, and assigned him a GAF score of 45. (R. 296). In December 2001, a counselor noted minimal progress toward goals, and assigned a GAF score of 50. (R. 292). In February 2002, a psychiatrist noted that plaintiff continued to be impulsive and hyperactive and that his appetite was poor. He reported "no change" in diagnosis. (R. 291). In March 2002,[2] the counselor again noted minimal progress toward goals and assigned a GAF score of 50. The counselor wrote, "medication changed due to side effects. Initial improvement at school, but return of impulsive behaviors evident at home + school." (R. 292). During that month, plaintiff's mother had reported that plaintiff was using profanity

---

[2] The March note for "Treatment Review Summary # 2" is dated "3-21-01" but follows a December 21, 2001 note for "Treatment Review Summary # 1." (R. 292).

and fighting on the school bus, and plaintiff had attended group therapy.  (R. 432-35).[3]

In April 2002, plaintiff continued to attend group therapy and the counselor assigned GAF scores of 50.  (R. 428-30).  After a group therapy session held on May 22, 2002 – one week before plaintiff's mother filed the present application for benefits – the counselor assigned plaintiff a GAF score of 55.  (R. 423).  Plaintiff missed his appointment in June.  (R. 421-22).

Plaintiff met with a therapist other than his primary therapist for an individual session on July 11, 2002.  His mother reported "inappropriate behaviors [with] brother," but plaintiff denied this.  The therapist recorded that plaintiff was "aggressive [with] play in office today [with] 2-headed dinosaurs," and that he was "very agitated during session."  The therapist assigned a GAF score of 55.  (R. 420).  On July 18, 2002, plaintiff's primary therapist wrote the following:

> Consumer's parent wanted him hospitalized at Hillcrest due to behavior.
> However, this therapist had not seen him since May and at that time he was
> functioning well.  Therapist reported to Dr. Khan that this consumer had
> functioned well when brother was out of the home – He suggested seeing
> [KMH] after brother out of the home to determine need for hospitalization –

---

[3]  In early April 2002, plaintiff's mother and school officials developed his Individualized Education Plan (IEP) for the 2002-03 school year.  In the IEP, plaintiff is described as performing below grade level in reading, math and language.  Improvements in his behavior during the 2001-2002 school year were noted, but he was determined to need continued assistance for behavior and academics.  (R. 79-93; see also R. 106-07).  During the 2002-2003 school year, plaintiff took most of his classes in the general education curriculum and received passing grades; however, he was able to be successful because he was permitted take additional time in the resource room to complete work that he had not finished.  The IEP developed in May 2003 for the following school year indicated that plaintiff would take affective skills, reading, math and language arts in a resource class and would take history, science and physical education in general education classes.  (R. 204, 208).

(R. 416).  Two weeks later, plaintiff returned for his regular individual therapy appointment.
The therapist noted, "Consumer told by Mom that therapist stated he needed to go to hospital
which was incorrect.  He is very restless + states Mom said if <u>bad</u> will go to hospital."  (R.
415)(emphasis in original).  She further stated, "Consumer's behavior is continuing w/
obstinate toward brothers, defiant toward parent w/ poor impulse control."  She assigned a
GAF score of 55.  (<u>Id</u>.).

On August 16, 2002, Elizabeth Cates, Ph.D., performed a consultative psychological
assessment of the plaintiff.  Plaintiff's mother told Dr. Cates that plaintiff "gets along with
his parents, but gets into fights with his brother," and "does not mind his mother."  She
further indicated that he was suspended from school on the day of the interview for
"threatening to stab his teacher and hitting the vice-principal," that he does not like to hear
"no," that he has a history of problems with his temper, and that he does not get along well
with other children his age and frequently gets into fights.  Dr. Cates stated:

> [KMH] was a normally appearing 10-year-old Caucasian male.  He was
> dressed appropriately in shorts and a shirt.  He walked without any difficulty
> and appeared his stated age.  His speech was of normal rate, but he seemed to
> stutter slightly.  His speech was logical and goal directed.
>
> [KMH] reported that he stays awake all night and does not eat.  He did deny
> any significant sadness or depression.  He also denied any significant worries.
> He did say that he gets mad "when people pick on me or say bad manes [sic]
> to me."  His mood was good during the interview.  His affect was within
> normal limits. He did fidget some during the interview and he was fairly
> active.  He was polite in answering questions.  His intellectual functioning is
> estimated to fall in the Average range.

(R. 308-09).  In summary, Dr. Cates noted, "[KMH] and his mother need to continue with

6

treatment to help get him under control. His impairment is moderate due to limitations in his social skills primarily. [KMH's] diagnosis is Oppositional Defiant Disorder and ADHD by history."  (R. 309).[4]

Plaintiff returned to the mental health center for treatment on August 20, 2002.  The therapist's treatment note indicates that plaintiff was suspended from school for one day for disobedience and defiance.  She rated his GAF as 50 and stated, "Consumer's behavior has worsened with changes at home. Mom is working and brother is in long term treatment. There is little structure in his life at this time[.]" (R. 414).  Plaintiff's mother called the therapist two days later to report that plaintiff had been suspended for two days due to inappropriate language.  (R. 413; 435A).  On September 9, 2002, plaintiff's therapist saw plaintiff for crisis intervention after plaintiff told "the appropriate people" about witnessing his older brother being raped in 1999 by his cousin's husband.  The therapist assigned a GAF score of 55 and stated, "Consumer was restless + somewhat anxious but appears glad the secret is out.  Parent reports he is doing well since being questioned + knowing perp cannot kill her –" (R. 373, 411-12).

On September 21, 2002, Dr. Gloria Roque, Ph.D., a non-examining psychologist, reviewed plaintiff's medical and school records.  She determined that plaintiff has a marked

---

[4] Plaintiff's mother testified that Dr. Cates met with plaintiff for only ten minutes and that, on the day of plaintiff's evaluation by Dr. Cates, plaintiff was having "a great day" and was laughing.  (R. 458).  According to plaintiff's school records and Dr. Cates' report, the evaluation occurred on the same day on which plaintiff had earlier been suspended from school for threatening to stab his teacher and to hit the assistant principal.  (R. 308, 435A).

7

limitation[5] in the domain of "interacting and relating with others," less than marked limitations in the domains of "acquiring and using information" and "attending and completing tasks," and no limitations in the remaining three domains. (Exhibit 9F, R. 310-318).

On September 24, 2002, the psychiatrist at the Chilton-Shelby Mental Health Center changed plaintiff's medication. (R. 411). The following day, plaintiff's counselor conducted an update evaluation "due to ongoing behavioral issues." (R. 324). Plaintiff's Axis I diagnosis remained ADHD - combined, and he was again assigned a GAF score of 50. (R. 327, 405). The counselor noted:

> Consumer is 10 year old male w/ ongoing behavioral issues, poor grades and poor coping skills. He has difficulty in school, on the bus and at home. There is parental support but poor compliance w/ consequences + consistency.

(R. 332, 410). At plaintiff's regular individual therapy session on October 21, 2002, plaintiff's mother reported more aggressiveness at home, and the therapist wrote that plaintiff's behavior was "more explosive [with] new meds." She again assigned a GAF score of 55. (R. 400). On November 5, 2002, the psychiatrist questioned whether "Bipolar [disorder] is a more likely disorder" given plaintiff's lack of response to stimulants. The psychiatrist changed plaintiff's medication regimen. (R. 398). The following day, plaintiff's therapist treated plaintiff in a group session. She observed that he "appears to be functioning

---

[5] As the Commissioner notes, Dr. Roque's notation is ambiguous in this regard. She placed a slash in the section to indicate "Marked," but also placed an arrow beside it pointing toward "Less than marked." (R. 313). The notation could reasonably be read to indicate a marked or less degree of limitation.

well at this time," and "[i]mproving toward goal." She assigned a GAF score of 55. (R. 397).

On December 3, 2002, Plaintiff's psychiatrist observed that plaintiff was euthymic and "slight[ly] irritable" and reviewed plaintiff's medications. (R. 395). Plaintiff's therapist assigned a GAF score of 50. She listed his Axis I diagnoses as ADHD and "bipolar Disorder, NOS." (R. 395). After a group session two days later, the therapist wrote that "[c]onsumer is quieter, more cooperative [with] brother out of home. He has no problems reported at school." She assigned a GAF score of 55. (R. 394).

Between January and early April 2003, plaintiff was seen in the mental health center for medication checks only, because the Department of Human Resources was involved in the home due to the sexual abuse of plaintiff's brother. (R. 382-93). On February 17, 2003, plaintiff's therapist assigned a GAF score of 50, and observed that the plaintiff was "verbal, active + happy," but that "[h]e continues [with] problems on bus + grades have also fallen at school." (R. 390) One week later, the psychiatrist switched plaintiff's medication from Clonidine to Seroquel, noting that plaintiff's ADD symptoms were better, but that he was not sleeping and was losing weight. The therapist assigned a GAF score of 50. (R. 389). On March 11, 2003, after plaintiff was suspended from school for poor behavior, the psychiatrist changed his medication back to Clonidine, noting that plaintiff had exhibited "much more aggression since stopping Clonidine." (R. 388). Two days later, the therapist noted that plaintiff appeared "more anxious." She assigned a GAF score of 50. (R. 386). On April 8, 2003, the psychiatrist increased plaintiff's dosage of Clonidine. (R. 385). On April 10,

9

2003, plaintiff's therapist met with plaintiff, his brother (also her client), and his mother to explain that she was leaving and to discuss the transfer of plaintiff's care to a different therapist. She assigned a GAF score of 50 (R. 383).

On May 28, 2003, plaintiff's mother advised the new therapist that the DHR worker had recommended that plaintiff resume individual therapy because the worker could not get him to talk. Plaintiff reported that he had no friends, did not play at PE and did not eat lunch with anyone. The therapist assigned a GAF score of 45. Plaintiff had individual therapy on June 30, 2003 with a different therapist. This therapist noted continued behavior problems, but rated plaintiff's GAF at 55. On the following day, the psychiatrist noted continued irritability and auditory hallucinations, and prescribed additional medication. (R. 378). A month later, the psychiatrist recorded that the plaintiff was "overall better" with decreased agitation and irritability and with no hallucinations. (R. 377). The therapist's note for July 30, 2003 indicates that plaintiff was "intense and hurried playing with power rangers," and his GAF was rated at 50.

On August 29, 2003, plaintiff's mother reported that plaintiff was doing well in school but was crying a lot, having a lot of anxiety and wetting the bed every night. Dr. Lucas, the psychiatrist at the mental health center, recommended that plaintiff see the therapist weekly. The therapist assigned a GAF score of 50. (R. 375).

On September 15, 2003, plaintiff's mother called to report that plaintiff had been suspended from school again; two days later she reported that he had been sent to alternative school. (R. 360-61). The therapist's treatment note for that date states:

> Cl was put in alternative school at Adair yesterday for at least 10 days.  Cl will
> not make eye contact usless asked to do so and then not for very long.  Cl
> looks down, eyes closed and rocks slightly and his speech is barely
> understandable.

(R. 359).  The therapist assigned a GAF rating of 45.  (Id.).  On September 19, 2003, she

called the assistant principal at Adair, who indicated that he was "waiting for Mental Health

to give him suggestions about what the school should do with [KMH].  He reported that most

of plaintiff's problems occurred in Special Ed classes, but that he "runs away" from regular

classes.  The assistant principal further related that "[KMH] will cry loudly in front of a class

of 6-12 graders about wanting his mother."  (R. 354).  The therapist referred plaintiff to the

psychiatrist, asking for an updated diagnosis.  On September 23, 2003, the psychiatrist

diagnosed ADHD combined, Bipolar Disorder NOS and Separation-Anxiety Disorder, and

he prescribed Zoloft to decrease plaintiff's anxiety.  (R. 351).  The therapist saw plaintiff the

following day and concluded that he was "OK to go to school today."  She assigned a GAF

score of 50.  (R. 349).  In individual therapy on October 1, 2003, she rated his GAF at 52.

(R. 345).  On October 9, she raised her assessment to a score of 55, after plaintiff reported

that he had been good in school, doing his work and not hitting anyone.   He also indicated

that he had been playing football in PE and that it was better than sitting by himself. (R. 344).

On October 16, 2003, plaintiff's mother told plaintiff's case manager that he was doing much

better in school and seemed to be adjusting well.  (R. 343).  On October 17, 2003, the

therapist again assessed plaintiff's GAF as 55.   (R. 342).   On October 21, 2003, the

psychiatrist noted "better control of symptoms" with decreased agitation and anxiety. (R.

341).  The following day, the therapist raised plaintiff's GAF score to 60, noting that the plaintiff reported that he was still not hitting anyone or getting into trouble.  Plaintiff's mother told the case manager that the plaintiff seemed to be doing well.  (R. 339-40).

At the administrative hearing on October 15, 2003, plaintiff's mother testified as follows:

Plaintiff is afraid to go to school and is "really scared of everybody."  (R. 449).  He does not want his mother out of his sight, and is on medication for separation anxiety.  He is in special education classes, except for Science and History.  He has behavioral problems at school all of the time. (R. 453).  In the first week of sixth grade, he was sent to an alternative school for ten days for fighting.  (R.. 451).  After he began taking medication for anxiety, he "settled back down" and was allowed to transfer back to his regular school.  On a "bad day," plaintiff cries constantly and "wants Mommy."  (Id.).  This happened daily until he began taking Zoloft.  He still has bad days, but the Zoloft has helped a little.  He has difficulty dealing with change.  (R. 451-52).  He had constant problems the whole school year, including fighting, crying, and "talking ugly."  (R. 453).  He fights verbally with his twelve-year-old brother.  Plaintiff's seventeen-year-old brother has bipolar disorder; he and the plaintiff fight physically. (Id.).  Plaintiff's mother is called to plaintiff's school "ninety percent of the school days," "like every other day."  (R. 454).  Plaintiff takes his medications consistently.  His mother does not notice any side effects.  Plaintiff sleeps with his mother because he is afraid to stay in his own room.  He takes "a long time" to go to sleep.  She puts him to bed at 8:30 or 9:00 and he usually goes to sleep at about 10:00 or 10:30.  She awakens

him at 6:00 for school.  He is an angry child, quick-tempered, and easily irritated.  His psychiatrist spoke about hospitalizing him, but has not because his anger is "getting better now."  His behavior changes from minute to minute.  He goes from being "real happy one second, to the next minute he'll be really bad." (R. 454-57).  He has good days when everything is fine, but it will last only until "somebody says something he don't like, and that's it, it sets him off."  He has consistently had this problem.  He has threatened to cut himself.  The previous year, he told his teacher that he was going to kill her by stabbing her in the back. The same day, he hit the vice principal.  (R. 458-59).  When he engages in behavior like that, his mother talks to him and tries to calm him down.  If that doesn't work, she puts him on "time out."  She tries to take him away from the situation, which works sometimes.  Although he previously had problems with his appetite, he now has a great appetite.  He can play video games for five to ten minutes at a time.  He is not able to watch television for thirty minutes.  He rides his bike and climbs trees. (R. 459-61).

On May 31, 2002, plaintiff filed an application for Supplemental Security Income (SSI), alleging disability since December 4, 1996 (his fifth birthday) on the basis of attention deficit hyperactivity disorder (ADHD).  On October 15, 2003, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing.  The ALJ rendered a decision on February 3, 2004, in which he found that plaintiff was not under a disability as defined in the Social Security Act at any time through the date of the decision.

On October 30, 2006, the Appeals Council denied plaintiff's request for review.[6]

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Factual findings that are supported by substantial evidence must be upheld by the court. See Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence."). The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

---

[6] The Appeals Council considered additional evidence in reaching its decision. R. 7; 435A-440.

## DISCUSSION

"Federal regulations set forth the process by which the SSA determines if a child is disabled and thereby eligible for disability benefits." Shinn ex rel. Shinn v. Commissioner of Social Sec., 391 F.3d 1276, 1278 (11th Cir. 2004) (citing 42 U.S.C. § 1382c(a)(3)(C)(I) and 20 C.F.R. § 416.906). "The process begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case [he] is considered 'not disabled' and is ineligible for benefits." Id. (citing 20 C.F.R. §§ 416.924(a), (b)). In this case, the ALJ determined that plaintiff has not engaged in substantial gainful activity. R. 16.

"The next step is for the ALJ to consider the child's 'physical or mental impairment(s)' to determine if [he] has 'an impairment or combination of impairments that is severe.'" Id. (citing 42 U.S.C. §§ 416.924(a), (c)). The ALJ found that plaintiff has the severe impairments of "ADHD-combined type, bipolar disorder, and ODD [oppositional defiant disorder]." R. 20.

"For an applicant with a severe impairment, the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child." Shinn, 391 F.3d at 1278 (citing 20 C.F.R. §§ 416.911(b), 416.924(d).) This determination is made according to objective criteria set forth in the Code of Federal Regulations (C.F.R.). As the Eleventh Circuit has explained,

> [t]he C.F.R. contains a Listing of Impairments ["the Listings", found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories. See id. § 416.925(a). For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations

appearing in these listings are considered "marked and severe." Id. ("The
Listing of Impairments describes ... impairments for a child that cause[ ]
marked and severe functional limitations.").

A child's impairment is recognized as causing "marked and severe
functional limitations" if those limitations "meet[ ], medically equal[ ], or
functionally equal[ ] the [L]istings." Id. § 416.911(b)(1); see also §§ 416.902,
416.924(a). A child's limitations "meet" the limitations in the Listings if the
child actually suffers from the limitations specified in the Listings for that
child's severe impairment. A child's limitations "medically equal" the
limitations in the Listings if the child's limitations "are at least of equal
medical significance to those of a listed impairment." Id. § 416.926(a)(2).

Id. at 1278-79.  In this case, the ALJ determined that plaintiff did not have any impairment

or combination of impairments that met or medically equaled a Listing.  R. 20.

"Finally, even if the limitations resulting from a child's particular impairment are not

comparable to those specified in the Listings, the ALJ can still conclude that those limitations

are 'functionally equivalent' to those in the Listings.  In making this determination, the ALJ

assesses the degree to which the child's limitations interfere with the child's normal life

activities. The C.F.R. specifies six major domains of life:

  (i) Acquiring and using information;

  (ii) Attending and completing tasks;

  (iii) Interacting and relating with others;

  (iv) Moving about and manipulating objects;

  (v) Caring for [one]self; and

  (vi) Health and physical well-being."

Shinn, 391 F.3d at 1279 (citing 20 C.F.R. § 416.926a(b)(1)). "The C.F.R. contains various

'benchmarks' that children should have achieved by certain ages in each of these life

domains." Id. (citing 20 C.F.R. §§ 416.926a(g)-(l)). "A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked' limitations in two of the domains [above], or an 'extreme' limitation in one domain." Id. (citing 20 C.F.R. § 416.926a(d) and § 416.925(a)).[7] The ALJ determined that K.L.H. has no limitations in the last three of the domains listed above, and "moderate but less than marked limitation" in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. (R. 20-21). Thus, the ALJ concluded that the plaintiff is not disabled.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because his finding that the plaintiff has a less than marked degree of limitation in each of the six domains is inconsistent with: (1) his statement that "this child is very definitely impaired. He has severe impairments[;]" (2) plaintiff's record of treatment by mental health providers and with the report of Dr. Cates; (3) his acknowledgement that plaintiff's academic performance is below the level of most students in his regular classes; (4) his acknowledgement that plaintiff is sometimes very defiant and disrespectful to adults; (5) the opinion of department psychologist Roque that plaintiff has a marked limitation in interacting and relating to others; and (6) the "consistently low" GAF ratings awarded by plaintiff's

---

[7] " 'marked' limitation is defined as a limitation that 'interferes seriously with [the] ability to independently initiate, sustain, or complete activities,' and is 'more than moderate.'" Henry v. Barnhart, 156 Fed.Appx. 171, 174 (11th Cir. 2005) (unpublished) (citing 20 C.F.R § 416.926a(e)(2)(I)). "An 'extreme' limitation is reserved for the 'worst limitations' and is defined as a limitation that 'interferes very seriously with [the] ability to independently initiate, sustain, or complete activities,' but 'does not necessarily mean a total lack or loss of ability to function.'" Id. (citing 20 C.F.R. § 416.926a(e)(3)(I)).

17

treating mental health providers.  Plaintiff further argues that his case should be remanded for a hearing before a different ALJ because of the ALJ's bias.

Plaintiff does not make any argument that appears to be specifically directed to the domains of moving about and manipulating objects, caring for himself, and health and physical well-being.  Instead, he focuses on his academic performance and behavior toward others.  Thus, the court concludes that plaintiff takes issue with the ALJ's finding of moderate, but less than marked, functional limitations as to the first three of the six domains: acquiring and using information, attending and completing tasks, and interacting and relating with others.

The court concludes that the ALJ's decision is supported by substantial evidence. Like the Commissioner, the court finds no contradiction in the ALJ's statement that plaintiff is "very definitely impaired" and has "severe impairments" and his conclusion that those impairments do not give rise to "marked" functional limitations.  The ALJ is required to find a severe impairment before he proceeds to determine whether that severe impairment causes functional limitations sufficiently serious to support a finding of disability under the Social Security Act.

Additionally, the ALJ's findings do not contradict the opinion of Dr. Cates.  Dr. Cates reviewed plaintiff's treatment records and spoke with plaintiff's mother regarding his behavior.  She concluded that his impairment was "moderate due to limitations in his social skills primarily."  (R. 309).  "Moderate" is less than marked.  See supra n. 7.  Additionally, as discussed above, it is not apparent that the ALJ's finding truly contradicts the opinion of

the non-examining agency psychologist, Dr. Roque, regarding plaintiff's limitation in the domain of interacting and relating to others.    However, even accepting that Dr. Roque concluded that plaintiff has a marked limitation in that single domain, the ALJ's error – if any – in failing to credit Dr. Roque's opinion fully as to plaintiff's functional limitations is harmless.  Dr. Roque did not find a "marked" or greater limitation in any other of the six domains.  Thus, if her opinion were fully adopted by the ALJ, it would not lead to a finding of disability.  See 20 C.F.R. § 416.926a (to functionally equal the listings, the child's impairment must result in "marked" limitations in two domains of functioning or and "extreme" limitation in one domain).  "When . . . an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand."  Caldwell v. Barnhart, 2008 WL 60289 (11th Cir. Jan. 7, 2008)(unpublished opinion).

Plaintiff relies heavily on his GAF scores, arguing that the ALJ disregarded the "consistently low GAF ratings awarded by Plaintiff's long-term treating psychiatrist."[8] (Doc. # 12, p. 8).  A GAF score is not dispositive on the issue of a claimant's functional limitations. See Kornecky v. Commissioner of Social Security, 2006 WL 305648, **13-14 (6th Cir. Feb. 9, 2006)("According to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning. . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score

---

[8]  All of the GAF ratings on which plaintiff relies were actually made by plaintiff's treating therapists, not by the psychiatrist.  (See documents cited by plaintiff at pp. 4-5 of brief).

in the first place."); <u>Wilkins v. Barnhart</u>, 2003 WL 21462579, **4 (7th Cir. Jun. 20, 2003)("[T]he GAF scale is intended to be used to make treatment decisions, . . . and nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score.").   Additionally, a GAF score of 41 to 50 is indicative of *either* serious symptoms or any serious impairment in social, occupational or school functioning.[9]   Further, the GAF score does not indicate the level of impairment with respect to a specific domain.  Thus, the assignment of a current GAF score of 50 is an observation about plaintiff's condition that does not speak to specific functional limitations.  Further, even assuming that the GAF scores assigned by plaintiff's therapists relate entirely to his functional limitations, his record of treatment evidences a significant number of scores falling in the range of 51 - 60, which correlates to "moderate symptoms" or "moderate difficulty in social, occupational or school functioning." DSM-IV-TR (2000), p. 34.

Plaintiff, in his summary of the evidence, includes only those scores falling in the 41-50 range.  Between plaintiff's therapy session on May 22, 2002 (about the time plaintiff filed the present application) and the session on October 22, 2003 (the most recent in the administrative record), plaintiff was assigned eleven GAF scores above 50 and twelve of 50 or below.  Of the latter category, ten ratings were right at 50, the upper limit of the "serious"

---

[9]   DSM-IV-TR (2000), p. 34; <u>see also</u> <u>id</u>. at 33 ("[I]n situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two.  For example, the GAF rating for an individual who is a significant danger to self but is otherwise functioning well would be below 20.").

range, and four of these occurred during a period of time when plaintiff was not receiving

individual therapy sessions because DHR was involved in his home. Only two of the twelve

ratings fell well within the "serious" range – the ratings of 45 on May 28, 2003 (R. 381) and

on September 17, 2003 (R. 359). In contrast, of the eleven scores falling in the moderate

range, only one was near the lower limit of the moderate range. Nine scores were 55 – right

in the middle of the moderate range – and one was a 60, the upper limit of the moderate

range. Thus, on this record, the court cannot conclude that the ALJ erred by failing to take

plaintiff's GAF scores into account; the ALJ's finding of less than marked limitations is, in

fact, supported by the GAF scores.

> Plaintiff further argues:
>
> [T]he judge specifically notes Plaintiff to be enrolled in special education due to his impairments. He notes that in comparison to the other participants in special education Plaintiff's academic performance is at approximately the same level as the other students in the resource room. He also acknowledges however, that Plaintiff's academic performance is below the level of most students in his regular classes. (R. 19). In terms of interacting and responding to adults overseeing his behavior in schoolwork the ALJ acknowledges that while Plaintiff's behavior is age appropriate most days in he sometimes very defiant and disrespectful when he cannot get his way.

(Doc. # 12, p. 8). The ALJ noted that plaintiff was in regular classes for science, history and

P.E. (R. 19). The ALJ further observed that plaintiff's IQ scores are in the low average

range and that plaintiff's teacher reported that, when plaintiff does not complete a task, it is

usually because he does not want to, and that this does not occur very often. (R. 21). These

observations are supported by substantial evidence of record. (See R. 208, 226, 230).

Contrary to plaintiff's apparent argument, the fact that plaintiff's academic performance is

below the level of most students in his regular classes does not dictate a finding of marked

limitations.  Further, plaintiff emphasizes that plaintiff is "sometimes very defiant and

disrespectful" with adults overseeing his behavior.  However, on October 17, 2003,

plaintiff's resource teacher noted that "[t]his student's behaviors towards adults most days

is age appropriate.  Some times he is very defiant and disrespectful.  This normally occurs

when he can not get his way.  He may call you a bad name or refer to you as 'stupid.'" (R.

230).  The fact that plaintiff's behavior is age appropriate "most days" supports the ALJ's

finding of a less than marked limitation in the domain pertaining to interacting and relating

to others.  Further, with regard to plaintiff's interaction with other students, the teacher

commented, "His interaction with other students in class appears normal to me.  I have not

observed him doing anything out of order.  Sometimes when playing games in class, he may

become a little upset when he does not win."  (Id.).  Thus, upon review of the record as a

whole, the court concludes that the ALJ's findings regarding plaintiff's limitations are

supported by substantial evidence.  "Substantial evidence is more than a scintilla, but less

than a preponderance.  It is such relevant evidence as a reasonable person would accept as

adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir.

1983).

        Plaintiff also raises the issue of ALJ bias.  After summarizing the evidence and stating

his conclusion that the plaintiff is not disabled, the ALJ wrote:

        Exhibit 7E is also most interesting.  It states that it is a form drafted by his
        representative for a teacher or a person associated with his school to rate the
        child's limitations in above referenced areas that are the required essence of

this decision and then to sign. What is frankly quite disturbing is that the ratings are already checked but the form is unsigned, thus apparently indicating that ratings were done by someone in the representative's legal office (not surprisingly, if accurate, they would lead to a finding of "disabled') with the intention of persuading a teacher or someone at the school to sign it with the choices already having been made, rather than leaving it up to the evaluator to make the choices that they are being asked to sign. However, most interestingly, no one has signed that form, apparently indicating that the representative tried but could not find a teacher or school professional who was willing to evaluate the claimant's impairments in [the] manner suggested by the representative as would be most beneficial to the claimant's case before us.

(R. 21-22). Plaintiff argues that the ALJ's conclusions are unfounded and "evidence a highly prejudicial attitude towards both Social Security claimant's representatives and their clients." (Doc. # 12, p. 10). Plaintiff seeks reversal and award of benefits or, in the alternative, a "hearing before a different Administrative Law Judge for a full and fair consideration of all of the medical evidence of record." (Doc. # 12, p. 11).

The court agrees that the conclusions reached by the ALJ regarding counsel's completing the form and attempting unsuccessfully to get someone to sign it are speculative. However, the fact remains that plaintiff submitted an unsigned, undated form for consideration by the ALJ. (R. 185-187A). The form includes only check marks and no discussion or examples of conduct leading to the indicated conclusions regarding the extent of plaintiff's functional limitations in the identified domains. Thus, the form, as submitted, did not provide the ALJ with a factual basis for determining that it was entitled to any

weight.[10]  The ALJ was not bound to develop this evidence for the plaintiff.  See Ellison v. Barnhart, 355 F.3d 1272 (11th Cir. 2003)(ALJ was "in no way bound to develop the medical record for [the two year period following the filing of plaintiff's application].").

The ALJ's decision reflects a thorough review of the remaining evidence of record. Further, in his decision, the ALJ did not discuss his speculation regarding the form until after he had set forth the basis for his decision that the plaintiff was not disabled and, thus, it appears that his speculation did not form the basis for his opinion regarding disability.  Under these circumstances, the court concludes that the assertions of the ALJ regarding the unsigned, undated form do not demonstrate that plaintiff was deprived of a fair hearing regarding his claim or that the process was compromised.[11]

## CONCLUSION

Upon review of the record as a whole, the court concludes that the ALJ's decision is supported by substantial evidence and should be affirmed.  A separate judgment will follow.

DONE, this 23rd day of January, 2008.

---

[10]  Additionally, there is nothing on the form to indicate that whoever completed it understood the nature of the domains under consideration.  The form is checked to indicate a "marked" limitation in the domain of moving about and manipulating objects.  (R. 187).  There is no other evidence in the record to suggest that plaintiff has any difficulty whatsoever with the gross and fine motor skills to be evaluated in this domain.  See 20 C.F.R. § 416.926a(j)("In this domain, we consider how you move your body from one place to another and how you move and manipulate things.  these are called gross and fine motor skills.").

[11]  The court notes that, even at the Appeals Council stage, plaintiff did not submit a signed form.  Rather, counsel attached a November 13, 2002 cover letter from a legal assistant at the law firm, addressed to plaintiff's teacher and asking her to complete a "Child Development and Functioning Form."  (R. 438-39).  Thus, even on the record before the court, there is no basis for attaching any weight to the conclusions indicated on the form.

24

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE